## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ZURICH AMERICAN INSURANCE COMPANY and AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | 17 C 2873 |
| OCWEN FINANCIAL CORPORATION, OCWEN LOAN SERVICING, LLC, TRACEE A. BEECROFT, SUSAN MANSANAREZ, and KEITH SNYDER, | ) ) ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

**CHARLES P. KOCORAS, District Judge:**

On October 30, 2017, Plaintiffs Zurich American Insurance Company and American Guarantee and Liability Insurance Company (collectively, "Zurich") filed an Amended Complaint ("Complaint") against Ocwen Financial Corporation and Ocwen Loan Servicing LLC (collectively, "Ocwen"), Tracee A. Beecroft ("Beecroft"), Susan Mansanarez ("Mansanarez"), and Keith Snyder ("Snyder") (collectively, "Defendants"). The Complaint seeks a declaratory judgment via eight distinct claims, that Zurich has no duty to defend and cover Ocwen in an underlying lawsuit. The following day, on October 31, 2017, Ocwen filed its Answer to the Complaint, inclusive of five affirmative defenses and two breach of contract counterclaims against the

Defendants.  Now before the Court are both Zurich's and Ocwen's cross-motions for partial judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), seeking a finding on the issue of Zurich's alleged duty to defend Ocwen in the underlying action.

## BACKGROUND

The following facts taken from the record are undisputed, except where otherwise noted.  Preliminarily, the Court notes that while the parties' perspectives and postures manifest factual recitations distinct in focus and characterization, rarely, if at all, do the parties dispute the actual facts underpinning this action.

### I.    The Underlying Action

#### A. The Snyder Action

On October 27, 2015, Snyder filed a lawsuit against Ocwen styled *Keith Snyder, et al. v. Ocwen Loan Servicing, LLC*, Case No. 1:14-cv-8461, in the Northern District of Illinois ("Snyder Action").  The current iteration of the three-count complaint in the Snyder Action, dated April 16, 2016, ("Snyder Complaint") sets out claims on behalf of Snyder, Mansanarez, and "all others similarly situated" against Ocwen for violations of the Telephone Consumer Protection Act ("TCPA") and the Fair Debt Collection Practices Act ("FDCPA").

Specifically, the Snyder Complaint alleges the following three claims: (1) Ocwen violated the TCPA by "making calls, except for emergency purposes, to cellular telephone numbers of [Snyder and the proposed class] using an [automatic telephone

dialing system ('ATDS')] and/or artificial or prerecorded voice," without "express prior consent"; (2) Ocwen's TCPA violations were "knowing or willful, or both"; and (3) Ocwen violated the FDCPA by (i) placing calls in violation of the TCPA to collect a consumer debt, (ii) falsely representing to Snyder the legal status of a loan that was not, in fact, owed by him, (iii) improperly calculating interest charged after the date of default and continuing to assess interest well after the debt had been charged off, (iv) demanding more than triple the amount of Snyder's maximum possible deficiency, and (v) attempting to collect on that debt after the applicable statute of limitations.

### B. The Beecroft Action

On January 15, 2015, Beecroft filed a lawsuit against Ocwen styled *Tracee A. Beecroft, et al. v. Ocwen Loan Servicing, LLC*, 0:15-cv-00094, in the District of Minnesota ("Beecroft Action"). The current iteration of the five-count complaint in the Beecroft Action, filed on June 1, 2015, is Beecroft's Second Amended Complaint ("Beecroft SAC"). It sets out claims both individually and on behalf of a class against Ocwen for violations of the TCPA, the FDCPA, and common law torts.

Specifically, the Beecroft SAC sets forth the following five claims: (1) Ocwen "willfully and knowingly violated the TCPA" by making "numerous calls" to Beecroft's cell phone using an ATDS without Beecroft's "prior express consent"; (2) Ocwen violated the FDCPA by (i) communicating to credit bureaus information that Ocwen knew or should have known to be false, (ii) attempting to collect Beecroft's debt by using an ATDS to call her, and (iii) attempting to collect an amount not expressly

authorized by Beecroft's mortgage or permitted by law, particularly as Beecroft alleged that her loan had already been discharged in bankruptcy; (3) Ocwen violated the Fair Credit Reporting Act ("FCRA") by illegally accessing Beecroft's credit report; (4) common law credit defamation against Ocwen via Ocwen's malicious communication of "false and derogatory information" about Beecroft resulting in harm to her credit reputation; and (5) common law invasion of privacy by intrusion on seclusion, which alleges that Ocwen's allegedly abusive debt collection practices "intentionally and/or negligently caused emotional harm to [Beecroft]…thereby invading and intruding upon [her] right to privacy." "In addition," Beecroft alleges, "Ocwen invaded [her] privacy by illegally obtaining [her] Experian credit report, which contained her personal financial data." On February 9, 2017, Beecroft dismissed all of her claims save for Count I, the TCPA action.

While her original complaint included a claim for invasion of privacy, it was Beecroft's First Amended Complaint ("Beecroft FAC"), filed on March 13, 2015, that fleshed out more severe privacy invasion allegations against Ocwen. Most seriously, in both the Beecroft FAC and Beecroft SAC, the following allegation was set forth:

> On December 5, 2013, [Beecroft] suffered a miscarriage. At the time, [Beecroft] was eight weeks pregnant and a prior ultrasound showed a viable and healthy pregnancy. The stress, and other negative emotions, caused by Defendant Ocwen's unrelenting phone calls and illegal attempts to collect the Loan were a significant contributor to [Beecroft's] miscarriage.

4

In both of her amended complaints, Beecroft described Ocwen's abusive collection efforts as including "letters, billing statements and repeated robocalls to [Beecroft's] cellular and home telephones."  Beecroft further alleged in both amended complaints that Ocwen's misconduct included "additional calls to [Beecroft's] home phone in an attempt to collect a Loan that [she] had discharged in bankruptcy, despite [Beecroft] telling Defendant Ocwen to stop calling."

The Beecroft FAC and Beecroft SAC also spelled out Beecroft's defamation allegations, in relevant part, as follows:

> On October 1, 2013, Ocwen began reporting [Beecroft's] Loan to the credit bureaus.  The information Ocwen reported to the credit bureaus included false and derogatory information.  Ocwen reported that [Beecroft] owed $157,382 as a past due balance, despite the Loan being discharged in bankruptcy.
>
> * * *
>
> Throughout the period of time that Ocwen was reporting false and derogatory information regarding the Loan on [Beecroft's] credit report, the information was seen by several of [Beecroft's] current and prospective creditors.  This inaccurate information caused [Beecroft] embarrassment, frustration and interfered with her relationships and standing with her creditors.

These allegations supported Beecroft's credit defamation claim, which was not present in her initial complaint.  Specifically, both amended complaints allege that "Ocwen maliciously communicated false and derogatory information about [Beecroft] when it knew or should have known that [she] wasn't liable for the Loan, because it was discharged in bankruptcy and foreclosure had previously been completed."  Both amended complaints' credit defamation causes of action state that Ocwen's "false

communications, acts and omissions resulted in the defamation of [Beecroft] and harmed her credit reputation." Beecroft's invasion of privacy and credit defamation claims each sought an award of actual damages for emotional distress.

### C. The Consolidated Action

On September 28, 2016, the Snyder Action and the Beecroft Action were consolidated in the Northern District of Illinois under case number 1:16-cv-08677 ("Consolidated Action"). Ocwen requested that Zurich provide defense and indemnification in the Consolidated Action; Zurich declined the request.

## II. Relationship Between Zurich & Ocwen as Insurer/Insured

### A. The CGL Policies

From September 15, 2010, to September 20, 2016, Zurich issued to Ocwen six general liability policies (collectively, "CGL Policies"). One such policy, No. CPO 6553581-04, covered Ocwen for the period from September 15, 2013, to September 20, 2014 ("2013-14 Policy"). Under the 2013-14 Policy, Zurich is required to pay "those sums that [Ocwen] becomes legally obligated to pay as damages because of 'bodily injury'" or "'personal and advertising injury' to which this insurance applies." The 2013-14 Policy also requires Zurich to "defend [Ocwen] against any 'suit' seeking those damages."

The 2013-14 Policy, as with the CGL Policies collectively, contemplates Coverage A and Coverage B. Coverage A applies to "bodily injury" that is "caused by an 'occurrence' that takes place in the 'coverage territory,'" which includes the United

States. "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including mental anguish, mental injury, shock, fright or death resulting from any of these at any time." "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Coverage B applies to "'personal and advertising injury' caused by an offense arising out of [Ocwens's] business…committed in the 'coverage territory' during the policy period." "Personal and advertising injury" is defined, in relevant part, as follows:

> [I]njury, including consequential 'bodily injury' arising out of one or more of the following offense:
> …
> d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
> e. Oral or written publication, in any manner, of material that violates a person's right of privacy

The CGL Policies also contain a Violation of Law Exclusion, which bars coverage for bodily injury, property damage, and personal and advertising injury:

> directly or indirectly arising out of or based upon any action or omission that violates or is alleged to violate:
>
> (1) The [TCPA], including any amendment or addition to such law;
>
> (2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;
>
> (3) The [FCRA], and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or
>
> (4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act or 2003 or FCRA and their

7

amendments and additions, or any other legal liability, at common law or otherwise, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, use of, sending, transmitting, communicating or distribution of material or information.

## B. The Umbrella Policies

From September 15, 2012, to September 20, 2016, Zurich also issued to Ocwen a series of four umbrella policies (collectively, "AGLIC Umbrella Policies"). One such policy, Zurich Commercial Umbrella Policy No. 5833066-01, was issued to Ocwen for the period from September 15, 2013, to September 20, 2014 ("Umbrella Policy"). The Umbrella Policy contemplates Excess Follow Form Liability Insurance Coverage ("Excess Coverage") as well as Umbrella Liability Insurance Coverage ("Umbrella Coverage").

Per the Umbrella Policy, Zurich has a duty to defend Ocwen in the following two circumstances:

1. Under [Excess Coverage], when the applicable limit of underlying insurance and other insurance has been exhausted by payment of loss for which coverage is afforded under this policy; or

2. Under [Umbrella Coverage], when damages are sought for bodily injury, property damage, or personal and advertising injury to which no underlying insurance or other insurance applies

The Excess Coverage provision provides as follows:

Under [Excess Coverage], we will pay on behalf of the insured those damages covered by this insurance in excess of the total applicable limits of underlying insurance. With respect to [Excess Coverage], this policy includes:

1. The terms and conditions of underlying insurance to the extent such terms and conditions are not inconsistent or do not conflict with the terms and conditions referred to in Paragraph 2. below; and

2. The terms and conditions that apply to [Excess Coverage] of this policy.

Notwithstanding anything to the contrary contained above, if underlying insurance does not apply to damages, for reasons other than exhaustion of applicable Limits of Insurance by payment of loss, then [Excess Coverage] does not apply to such damages. Also, [Excess Coverage] does not apply to any form of casualty business crisis expense insurance even if such insurance is afforded under underlying insurance or would have been afforded except for the exhaustion of the Limits of Insurance of underlying insurance.

The Umbrella Coverage provision provides as follows:

Under [Umbrella Coverage], we will pay on behalf of the insured those damages the insured becomes legally obligated to pay by reason of liability:

1. Imposed by law because of bodily injury, property damage, or personal and advertising injury; or

2. Assumed under an insured contract because of bodily injury or property damage;

covered by this insurance but only if the injury damage or offense arises out of your business, takes place during the policy period of this policy and is caused by an occurrence happening anywhere. We will pay such damages in excess of the Retained Limit specified in Item 5. of the Declarations or the amount payable by other insurance, whichever is greater.

[Umbrella Coverage] does not apply to any loss, claim or suit for which insurance is afforded under underlying insurance or would have been afforded except for the exhaustion of the Limits of Insurance of underlying insurance.

9

## LEGAL STANDARD

Having filed a joint appendix to their cross motions and confined their arguments to the undisputed contents of said appendix and the allegations set forth in the complaints that gave rise to the Underlying Action, the parties now marshal Fed. R. Civ. P. Rule 12(c) to ask the Court to settle a strictly legal question: whether Zurich owed Ocwen a duty to defend in the Underlying Action. Where, as here, Rule 12(c) has been used "in its customary application to attempt to dispose of the case on the basis of the underlying substantive merits…the appropriate standard is that applicable to summary judgment, except that the court may consider only the contents of the pleadings." *Alexander v. City of Chi.*, 994 F.2d 333, 336 (7th Cir. 1993). The parties' posture also satisfies the tenet that "[a] judgment on the pleadings is proper when only questions of law, and not questions of fact, exist after the pleadings have been filed." *All Am. Ins. Co. v. Broeren Russo Const., Inc.*, 112 F.Supp.2d 723, 728 (C.D. Ill. 2000).

The parties agree that Illinois law governs this action. "Under Illinois law, the interpretation of an insurance policy is a question of law that is properly decided by way of summary judgment." *Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 628 (7th Cir. 2009) (internal citation and quotation marks omitted). "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises." *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 346 (7th Cir. 2010). "Both the policy terms and the allegations in the underlying complaint are liberally construed in favor of the insured,

10

and any doubts and ambiguities are resolved against the insurer." *State Farm Fire & Casualty Co. v. Perez*, 387 Ill.App.3d 549, 553 (2008). "However, this general rule favoring the insured must yield to the paramount rule of reasonable construction which guides all contract interpretations." *Western States Ins. Co. v. Bobo*, 268 Ill.App.3d 513, 516 (1994).

## DISCUSSION

### I.  Allegations in the Underlying Action Implicative of a Duty to Defend

We look first to Ocwen's argument that the Underlying Action was covered in the insurance agreements between Ocwen and Zurich. While the Underlying Action contemplates a variety of misconduct across multiple lawsuits, Ocwen's plea for coverage relies on a select few allegations unique to the Beecroft Complaint. Allegations that, having putatively occurred in 2013, would have triggered Zurich's defense obligation under the 2013-2014 Policy.

#### A. Allegations of Bodily Injury Under Coverage A

Ocwen first contends that Count V of Beecroft's SAC triggered Zurich's duty to defend because it alleged bodily injury caused by an occurrence. Coverage A applies to "bodily injury" that is "caused by an 'occurrence' that takes place in the 'coverage territory,'" which includes the United States. "Bodily injury" includes "mental anguish, mental injury." "Occurrence" is defined as "an accident, involving continuous or repeated exposure to substantially the same general harmful conditions."

11

In Count V, Beecroft brings forth an invasion of privacy claim, stemming from repeated and unlawful telephone calls, Ocwen's illegal obtainment of her credit report, and a subsequent miscarriage culminating from her emotional distress. Because Beecroft's SAC alleges "bodily injury" in the form of mental anguish and a subsequent miscarriage, Ocwen argues that Count V falls within the purviews of Coverage A.

## B. Allegations of Personal and Advertising Injury Under Coverage B

Ocwen next contends that Counts IV and V of Beecroft's SAC triggered Zurich's duty to defend after alleging personal and advertising injury caused by an offense arising out of Ocwen's business. Coverage B applies to "'personal and advertising injury' caused by an offense arising out of [Ocwens's] business . . . committed in the 'coverage territory' during the policy period." "Personal and advertising injury" is defined, in relevant part, as follows:

> [I]njury, including consequential 'bodily injury' arising out of one or more of the following offense:
> …
> d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
> e. Oral or written publication, in any manner, of material that violates a person's right of privacy

In Count IV, Beecroft's SAC alleges credit defamation, arguing that Ocwen improperly accessed Beecroft's credit report and maliciously communicated false information to her credit bureau. As a result, her credit was devalued. Because Beecroft's SAC alleges "personal and advertising" injury in the form of slander and

injury to her personal and credit reputation, Ocwen contends that Count IV falls within the purviews of Coverage B.

In Count V, Beecroft brings forth the invasion of privacy claim, stemming from Ocwen calling Beecroft on her home and cellular telephone, as well as sending her letters and billing statements to collect on a loan she did not owe. Ocwen asserts that these letters and billing statements qualify as a "publication of material" under Illinois law. *Valley Forge Ins. Co. v. Swiderski Elecs.*, 860 N.E.2d 307, 317-18 (Ill. 2006). Because Beecroft's SAC alleges "personal and advertising" injury in the form of these written publications, Ocwen argues Count V falls within the purviews of Coverage B.

Zurich does not respond to these particular assertions and they appear to be undisputed. It is well-settled that "a person waived an argument by failing to make it before the district court." *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011). Instead, Zurich contends that the debt misrepresentation allegation from Snyder's Complaint fails to fall within any coverage of this insurance policy. Count I of the Snyder Complaint alleged debt misrepresentation, asserting that Ocwen attempted to collect debt outside of the statute of limitations and sought a greater amount of debt than actually owed. Zurich argues that this claim falls within the purview of neither Coverage A nor Coverage B as it fails to allege "bodily injury," "property damage," "personal and advertising injury," nor a "publication" that slandered or violated her privacy. With Ocwen providing no response to this articulation, we find that the insurance agreements do not cover the debt misrepresentation claim.

13

We next evaluate the applicability of the Exclusion policies to Counts IV and V of Beecroft's SAC.[1]  If the Exclusion policies apply, Zurich is precluded from its duty to defend under the 2013-2014 Policy.  If Zurich has no duty to defend under the 2013-2014 Policy, we next evaluate whether Beecroft's SAC falls within the purview of the Umbrella Policy.

## II.     The Exclusion Provisions

As an independent basis to defeat the Underlying Action, Zurich relies on the policy exclusion for "Recording and Distribution Or Information In Violation of Law Exclusion" ("Exclusion 1").  Exclusion 1 applies to bodily injury, property damage, and personal and advertising damage resulting directly or indirectly from the Telephone Consumer Protection Act ("TCPA"), Fair Credit Reporting Act ("FCRA"), Fair and Accurate Credit Transactions Act ("FACTA"), or "any federal . . . statute . . . at common law  .  .  .  that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, use of, sending, transmitting, communicating, or distribution of material or information."

The 2013-2014 Policy also involves two other exclusions: the "Violation of Communication or Information with Law Exclusion" ("Exclusion 2") and "Exclusive-Violation of Statutes that Govern E-mails, Fax, Phone Calls, or Other Methods of

---

[1] Counts IV and V of Beecroft's Complaint contain the same factual assertions as Counts I, II, and III of the same Complaint, as well as Count II of the Snyder Complaint.  The parties' briefing accordingly focuses solely on Counts IV and V of the Beecroft Complaint.  Therefore, this Court evaluates Counts IV and V in determining Zurich's duty to defend, as it applies to all relevant claims.

Sending Material or Information."[2]   Exclusion 2 applies to bodily injury, property damage, and personal and advertising damage resulting from or arising out of the TCPA, Drivers Privacy Protection Act, Controlling of Assault of Non-Solicited Pornography and Marketing Act, or "any other federal . . . statute . . . that imposes liability for . . . unlawful use of telephone or transmission device . . . unlawful use . . . disclosure or redisclosure of personal information in any manner by any insured or on behalf of any insured."

Ocwen alleges that Exclusion 1 conflicts with these other exclusions, arguing amongst their differing applicability to common law liabilities, as well as statutory and regulatory ones.  Specifically, Ocwen argues that the conflicting policies cannot extend to the invasion of privacy or credit defamation claim, and as a result, this Court should interpret Exclusion 2 because it is the narrowest.

To support its assertion, Ocwen relies on *Panfil v. Nautilius Ins. Co.*, 799 F.3d 716, 719-20 (7th Cir. 2015).  In *Panfil*, the plaintiff was a subcontractor's employee who was injured within the scope of his employment.  The court evaluated two exclusion policies-the Contractor-Subcontractor Work Exclusion ("Contractor Exclusion") and the Employee Exclusion.  *Id.* at 719-20.  The court first noted that the plaintiff would be covered under the Contractor Exclusion because it "limit[s] any coverage for injury at the construction site to injury arising out of work done by contractors or subcontractors working for the insured.  *Id.* at 721.  However, the

---

[2] Zurich has not argued the applicability of this exclusion.

employee exclusion "places a second, separate limit on coverage, which further restricts bodily coverages to injuries sustained by non-'employees.'" *Id.*

When read in conjunction, the policy was meant to "preserve coverage for injuries to non-'employees' arising out of work of subcontractors working solely for the insured." *Id.* Accordingly, the policy was deemed ambiguous and construed against the insurer. *Id.* at 722.

We first turn to the language of the Exclusions themselves. The express terms of Exclusion 1 applies to bodily injury, property damage, and personal and advertising damage resulting directly or indirectly from the TCPA, FCRA, FACTA, or "any federal . . . statute . . . at common law . . . that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, use of, sending, transmitting, communicating, or distribution of material or information."

The express terms of Exclusion 2 applies to bodily injury, property damage, and personal and advertising damage resulting from or arising out of the TCPA, Drivers Privacy Protection Act, Controlling of Assault of Non-Solicited Pornography and Marketing Act, or "any other federal . . . statute . . . that imposes liability for . . .unlawful use of telephone or transmission device . . . unlawful use . . . disclosure or redisclosure of personal information in any maner by any insured or on behalf of any insured."

Here, unlike *Panfil*, we find Exclusion 1 and 2 unambiguous and not susceptible to more than one reasonable meaning. Upon examination, we fail to see how Exclusion 2 limits or contradicts Exclusion 1. We agree with Zurich's assertion that, based on

their plain meaning, the relevant exclusions do not "give" any coverage at all, but exclude the same conduct. While Exclusion 1 explicitly applies to common law claims based on excluding conduct, Exclusion 2 implicitly applies to these same claims based on its "arising out of" language. We find no "inherent contradiction" when the two exclusions are read together, and Exclusion 2 fails to include any limiting language to contradict or override Exclusion 1. *See Pekin Ins. Co. v. Equilon Enterprises LLC*, 980 N.E.3d 1139, 1148-49 (Ill. App. 2012) (finding an "inherent contradiction" because the "two endorsements when read together are ambiguous" and accordingly construed the endorsements in favor of the insured.)

However, as described below, even if Ocwen was correct and an ambiguity exists, Exclusion 2 still precludes coverage for the Underlying Action.

## III.    Both Exclusions Preclude Coverage

When "an insurer denies a duty to defend based on an exclusionary clause within a policy, 'its application must be clear and free from doubt.'" *Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*, 2015 WL 1543216, at *5 (N.D. Ill. 2015) quoting *Hurst-Roscoe Eng'rs, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995). "The burden of proving that a claim falls within an exclusion rests squarely on the insurer," and "[a]ny ambiguities within the policy must be construed in favor of the insured." *Id.* However, "the court must not create an ambiguity where none exists; a clear and unambiguous provision must be applied as written." *Id.*

17

Zurich relies on *G.M. Sign, Inc. v. State Farm Fire & Casualty Co.*, 18 N.E.3d 70 (Ill. App. 2014), where the court denied coverage for the claims based on an exclusionary provision in the insurance policy. The provision excluded coverage for "[b]odily injury, property damage, personal injury, or advertising injury arising directly or indirectly out of any action or omission that violates or is alleged to violate: (a) the TCPA; or (b) any statute, ordinance or regulation . . . that prohibits or limits the sending, transmitting, communicating, or distribution of material or information." *Id.* at 74.

When interpreting the "arising out of" language, the court found the language vague and required interpretation in favor of the insured. *Id.* at 78. "Arising out of' means 'originating from,' 'having its origin in,' 'growing out of,' and 'flowing from.'" *Id.* (citing *Maryland Cas. Co. v. Chicago. & N.W. Transp. Co.*, 126 Ill. App. 3d 150, 154 (1984)).

"[I]n the absence of prevailing authority from the state's highest court, federal courts ought to give great weight to the holdings of the state's intermediate appellate courts and ought to deviate from those holdings when there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). Ocwen doesn't challenge the applicability of *G.M. Sign*, and given the similarly worded exclusionary language, the decision is afforded "great weight."

## A.    Exclusion 1 Precludes Coverage

The express terms of Exclusion 1 applies to bodily injury, property damage, and personal and advertising damage resulting directly or indirectly from the TCPA, FCRA, FACTA, or "any federal . . . statute . . . at common law . . . that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, use of, sending, transmitting, communicating, or distribution of material or information."

Ocwen contends that Count V, invasion of privacy by intrusion on seclusion, falls outside the purviews of Exclusion 1.  Count V alleges Ocwen repeatedly and unlawfully called Beecroft's home and cellular telephone, illegally obtained her Experian credit report, and as a cumulative result of her emotional distress, she suffered a miscarriage.  Ocwen argues Exclusion I is inapplicable for three reasons: (1) the common law elements for invasion of privacy by seclusion under Minnesota law have not been satisfied; (2) the repetitive calls, letters and billings are not actionable by the TCPA; and (3) Beecroft's SAC alleges independent TCPA violations.

First, Ocwen argues that the allegations fail to satisfy Minnesota's common law elements for invasion of privacy.  This argument is rejected based on *G.M. Sign*.  Rather than peering at the privacy by seclusion elements, the inquiry must be driven by the policy itself.  The exclusionary principle reveals that its focus is not on the legal elements, but factual causes of  bodily injury, property damage, and personal and advertising damage  resulting directly or indirectly from the TCPA, FCRA, FACTA, or "any federal . . . statute . . . at common law . . . that addresses, prohibits, or limits the

19

printing, dissemination, disposal, collecting, recording, use of, sending, transmitting, communicating, or distribution of material or information."

Count V first articulates that Beecroft's privacy was invaded by Ocwen's debt collection efforts, stemming from its utilization of prerecorded and artificial telephone calls, and calls to Beecroft's personal cell phone. We find that the prerecorded and artificial calls fall squarely within the TCPA, and as further explained below, the calls to Beecroft's personal cell phone fall within the Fair Debt Collection Practices Act ("FDCPA").

Count V next articulates that Beecroft's privacy was invaded after Ocwen illegally obtained her credit report. Under FCRA § 1681b(f), "a person shall not use or obtain a consumer report for any purpose" unless certain requirements are met. Accordingly, we find this allegation falls squarely within the FCRA, an expressed enumerated statute in Exclusion 1.

Count V's final articulation is that, as a cumulative result of Beecroft's emotional distress, she suffered a miscarriage and mental anguish. As further explained below, the factual assertions giving rise to Beecroft's injuries resulted from FDCPA and FCRA violations. The exclusion and provisions apply to conduct and causes and not to consequences or damages.

Accordingly, because the asserted claims in Count V falls within the purviews of Exclusion 1, Ocwen's contention is inapplicable.

Second, Ocwen argues that the repeated robocalls to Beecroft's cellular and home telephone falls outside the purview of the TCPA. Ocwen articulates that the TCPA is violated when artificial or prerecorded voice calls are used to deliver messages without the prior consent of the called party, subject to certain exceptions. 47 U.S.C. § 327(b)(1)(8). Ocwen concludes because the underlying action used live "operators" to make the calls, no TCPA violation occurred, and Zurich's duty to defend has been triggered. We disagree.

Zurich correctly points that out under the FDCPA, a collector is forbidden from "causing a telephone to ring or engage any person in telephone conversation repeatedly or continuously with the intent to annoy, abuse, or harass any person at that called number." 15 U.S.C. § 1692d(5). Despite Beecroft allegedly telling Ocwen to stop calling, Ocwen called Beecroft 58 times. Because Beecroft pleaded for the calls to stop, we find the FDCPA applicable as Ocwen's calls were meant to annoy or harass.

We also find that the FDCPA falls within the Exclusion's catch-all provision. The catch-all provision applies to bodily injury resulting directly or indirectly out of "any federal . . . statute . . . at common law . . . that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, use of, sending, transmitting, communicating, or distribution of material or information." Because the catch-all provision contemplates bodily injury arising directly or indirectly out of any statutes that envisages communication, the FDCA is applicable.

21

By asserting the FDCPA, Ocwen alleges that Zurich violated the mend the hold doctrine, which prohibits "the defendant in a breach of contract suit . . . to change its defenses, at least without good reason for doing so." *Ryerson, Inc. v. Fed. Ins. Co.*, 676 F.3d 610, 614 (7th Cir. 2012). "Where a party gives reason for his conduct and decision touching anything involved in the controversy, he cannot, after litigation has begun, change his ground and put his conduct upon another and different consideration. He is not permitted thus to amend his hold. He is stopped from doing it by a settled principle of law." *Liberty Mut. Ins. Co. v. Am. Home Assur. Co.*, 368 Ill. App. 3d 948, 958 (2006). For mend the hold to apply, Ocwen must prove: (1) "the offending party changed the initial reason for not performing on a contract to a completely different reason during litigation," and "(2) there must be prejudice to the other party." *Ryerson, Inc.*, 676 F.3d at 614.

We find mend the hold inapplicable. First, Ocwen at all times was aware that Zurich was relying on the FDCPA, and at no point during this litigation has Zurich switched positions. Second, even if Zurich switched positions, Ocwen has failed to demonstrate that it was surprised or prejudiced by Zurich's contemplation of the FDCPA when discussing Beecroft's invasion of privacy claim.

Next, Ocwen argues that the mailed letters do not fall under the TCPA. However, we agree with Ocwen that the mailed letters are unrelated to this claim. Beecroft's only allegations about these letters are: (1) Beecroft sent Ocwen letters about the loan being on her credit report; (2) Ocwen mailed Beecroft responses promising to remove it; (3)

Ocwen failed to timely remove it; and (4) Ocwen did not have authority to collect the loan. Beecroft does not allege that these letters violated her right to privacy, nor that they are implicative of any "personal and advertising" injury.

Third, Ocwen argues that Beecroft's SAC alleges independent TCPA violations. Specifically, Ocwen contends that the injuries asserted from Beecroft's alleged miscarriage are independent from the TCPA violations, and as such, articulates independent claims with recognized causes of actions. While Beecroft's miscarriage is disheartening, we do not agree with Ocwen's position.

This Court "does not construe a contractual provision by looking at its title alone." *Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*, 2015 WL 1543216, at *8 (N.D. Ill. 2015). As alleged and discussed, the miscarriage arose because of FDCPA and FCRA violations. Accordingly, Exclusion 1 precludes Zurich's duty to defend.

### B. Exclusion 2 Precludes Coverage

Even if we apply the narrower Exclusion 2 language, Zurich has no duty to defend. Ocwen argues that Count V and VI of Beecroft's Complaint is not within the purviews of Exclusion 2 because by its express terms, it applies only to: (1) the FDCPA, (2) Drivers Privacy Protection Act; (3) Controlling of Assault of Non-Solicited Pornography and Marketing Act, or (4) any other federal, state, or local statute, regulation, or ordinance. While conceding TCPA claims would be excluded, Ocwen argues the FDCPA and FCRA claims are not. We disagree.

Count IV alleges that Beecroft's personal and credit reputation was harmed when Ocwen communicated false information to her credit bureau. Specifically, Beecroft's SAC alleges that Ocwen knew or should have known that she was not liable for the loan because it was discharged in bankruptcy. We agree with Zurich and find that this articulation falls within the FDCPA.

The FDCPA prevents a debt collector from "communicating or threatening to communicate to any person credit information which is known or which should be known to be false." 15 U.S.C. § 1692e(8). Because Beecroft alleges Ocwen knew or should have known that her loan was discharged, 15 U.S.C. § 1692e(8) applies. We also find that 15 U.S.C. § 1692e(8) falls within Exclusion 2's catch-all provision.

The catch-all provision applies to bodily injury resulting from or arising out of "any other federal . . . statute . . . that imposes liability for . . .unlawful use of telephone or transmission device . . . unlawful use . . . disclosure or redisclosure of personal information in any manner by any insured or on behalf of any insured." Beecroft's SAC alleges that Ocwen falsely communicated personal information in a manner that harmed her. We find these factual assertions arise out of FDCPA violation, which falls within the catch-all provision.

Ocwen next argues that Count V falls outside the purviews of Exclusion 2. First, Count V alleges in relevant part that Ocwen made robocalls to Beecroft. Having already determined that Ocwen's robocalls fall within the previews of the FDCPA, we

24

examine whether the FDCPA is contemplated by the catch-all provision in Exclusion 2.

The catch-all provision applies to bodily injury arising out of any federal statute that imposes liability for an unlawful use of telephone or transmission device. Here, because the FDCPA and catch-all provision contemplate the unlawful use of telephones, we find that the FDCPA claim falls within the purviews of the catch-all provision.

Next, Count V alleges that Ocwen illegally obtained her credit report, violating the FCRA. Here, because Beecroft's injury arose from a FCRA violation resulting from disclosure of her personal information, Zurich has no duty to defend under the catch-all provision.

Finally, Count V alleges that as a cumulative result of her emotional distress, Beecroft suffered a miscarriage. The alleged miscarriage was derived from the same factual assertions that gave rise to the FDCPA and FCRA violations. Accordingly, because the alleged miscarriage arose out of the FCRA and FDCPA violations, Ocwen's contention is inapplicable.

## IV.    The Umbrella Policy and Exclusion

Ocwen also argues that if the 2013-2014 Policy excludes all potential coverage for all claims, Zurich has a duty to defend under the Umbrella Policy. The Umbrella Policy provides coverage for claims that fall within the Zurich CGL policies or for damages "imposed by law because of bodily injury, property damage, or personal and

advertising injury; or assumed under an insured contract because of bodily injury or property damaged covered by this insurance."

The exclusion to the Umbrella Policy is substantially similar to Exclusion 1, and bars coverage for bodily injury, property damage, and personal and advertising injury for claims directly or indirectly arising out of the TCPA, FCRA, FACTA, and any "federal . . . statute . . . at common law or otherwise . . . that prohibits, or limits the printing, dissemination, disposal, collecting, recording, use of, sending, transmitting, communicating or distribution of material or information."

We conclude that Zurich, for the reasons explained when discussing the applicability of the 2013-2014 Policy, does not have a duty to defend under the umbrella Policy.

In sum, we conclude that the policies do not provide coverage for the Underlying Action. We have liberally construed the policy to give reasonable effect to the provisions. However, after careful evaluation, we find that the Underlying Action fails to potentially trigger a duty to defend under the insurance agreements.

## V.    **Breach of Contract**

Ocwen asserts counterclaims arguing for breach of contract arising from Zurich's improper denial of coverage under the 2013-2014 and Umbrella Policies. Having found that Zurich has no duty to defend under either insurance policies, Ocwen's breach of contract claim fails.

26

## **CONCLUSION**

For the aforementioned reasons, the Court finds that Zurich has no duty to defend Ocwen in the Underlying Action.  Because there is no coverage available to Ocwen, summary judgment in the entire case is granted in Zurich's favor.  It is so ordered.


Dated: 10/11/2018                              Charles P. Kocoras
                                               United States District Judge